## WACHSMAN v. WACHSMAN.
### No. 4890.

District Court, E. D. New York.
Aug. 18, 1930.

John L. Ketcham, of New York City, for plaintiff.

I. Konigsberg, of New York City, for defendant.

CAMPBELL, District Judge.

This is an action in equity brought for injunctive relief and an accounting of profits and damages because of the alleged infringement by the defendant of patent No. 1,358,483, issued by the Patent Office to Adolph Wachsman, the plaintiff, for improvement in stop mechanism for knitting machines, dated November 9, 1920.

Plaintiff also alleged that defendant's infringements were of an aggravated type, such that they would of themselves constitute a cause of unfair competition were the necessary jurisdictional facts here present.

Defendant interposed an answer setting up the twofold defenses of invalidity and noninfringement, and denying plaintiff's allegations of aggravated infringement, or that his acts would, if the necessary jurisdictional facts were present, constitute unfair competition.

Plaintiff has good title to the patent in suit. Plaintiff in the specification of the patent in suit describes the invention as follows:

"Speaking generally, the invention, from a functional standpoint, is an improvement in devices of the character specified, which operate to release a catch or equivalent element, which, in turn, causes a member associated with the knitting machine to be thrown into operation for the purpose of stopping the machine, whenever a knot or other similar defect in the yarn or thread coming from the bobbin stand occasions the thread, through suitable mechanism, to exert undue tension or pull, thereby actuating the stop device.

"Aside from the general structure of the device, the invention, from a more specific standpoint, embodies improvements in the spring connection for closing the circuit through the device, in the means for regulating the tension on the actuating lever of the device, and in the efficient, short leverage whereby the lever and spring are brought into positive engagement without producing undue pressure on the spring." Page 1, lines 12 to 34, both inclusive.

In the device of the patent in suit there is a hooked extension 11, with a nose 12, which normally extends downward into and through slot 10 in the lever 9, and under ordinary conditions keeps the thread from falling off. A lever 9, which is supported by a spring tension, coiled spring 15, regulated at the rear. In the event of an obstruction or undue tension on the thread, the lever 9 is depressed and the thread is allowed to escape. In depressing the lever 9 there is a slight spring, leaf spring 21, that is connected with the electrical source through screw 22 and lead 27 of a battery, and the circuit is established, and that operates a magnet 28 which actuates the trip 34, that throws off the stop motion or stop mechanism of the machine.

These elements are included in claim 1, and the essentials of the invention are in the arm that swings down, the member that prevents the thread from falling off, and the fact that electrical contact is made when undue tension comes in.

The patent in suit has three claims, and this suit is based on all the claims, which read as follows:

"1. In a stop mechanism for knitting machines, a suitable support, a lever pivoted thereto provided with a slot, a hooked member having its nose or end normally extending through the slot, a source of electrical energy, an electromagnet, a trip actuatable thereby, and a leaf spring in circuit with the source of electrical energy and magnet and cooperating with the pivoted lever so that the latter may make and break the circuit depending on the position of the hooked member with reference to the slot in said lever, whereby, when the lever is in engagement with the spring, the electromagnet is energized and the trip actuated, and when the lever is disengaged from the spring the circuit is broken.

"2. In a stop mechanism for knitting machines, a suitable support, a lever pivoted thereto, a source of electrical energy, an electromagnet, a trip actuatable thereby and a leaf spring in circuit with the source of electric energy and magnet and cooperating with the pivoted lever, a spring having one end affixed to said pivoted lever and the other end secured to a second lever and means for adjusting the latter to vary the tension on the spring and the pivoted lever.

"3. In a stop mechanism for knitting machines, a suitable support, a lever pivoted thereto, a hooked member extending from the support and cooperating with the lever so as to normally form an inclosed space for the passage of the thread to a knitting machine, a source of electrical energy, an electromagnet, a trip actuatable thereby and a leaf spring in circuit with the source of electric energy and magnet and cooperating with the pivoted lever, a coiled spring for exerting tension on the lever, and a manually operated

lever for regulating the tension on the spring."

As appears from what has been said, the patent is a narrow one.

The defendant offered in evidence the following patents, the disclosures of which he contends anticipate the patent in suit:

Patent No. 477,986, issued to Albin Beyer, for electrical stop motion for knitting machines, dated June 28, 1892, discloses the central idea of a spring closing an electric circuit when the thread is tense and stopping the machine. The device, however, is not only radically different in structure and arrangement from that of the patent in suit, but also in that it is inferior in the essential idea of guarding against breakage. The thread depresses a spring by passing through an eye therein with nothing to prevent a break.

Patent No. 706,839, issued to Martin & Palmer, for automatic stop motion for knitting machines, dated August 12, 1902. This patent was before the Examiner as the additional claim 4 filed by the plaintiff was rejected on it, but the claims in suit were allowed by the Patent Office with this patent before it, and that is readily understood as the structure combination and arrangement all differ from the patent in suit, and all resiliency and safeguarding against breakage of the thread from overtension is lacking, as is also the leaf spring of the patent in suit.

Patent No. 706,840, issued to Martin & Palmer, for automatic stop motion for knitting machines, dated August 12, 1902, discloses a combination and arrangement entirely different from that of the patent in suit.

Patent No. 727,429, issued to Arthur L. Patterson, for electric stop motion for knitting machines, dated May 5, 1903, discloses a device in which the operation of a knitting machine is stopped whenever the yarn breaks, or too much slack occurs, which is entirely different from the patent in suit, which is concerned with knots, enlargements, and obstructions in the thread.

Patent No. 781,287, issued to Ulysses G. Lee, for electrical stop motion, dated January 31, 1905, discloses a device essentially different in structure, mode of operation, and function; the thread being looped several times over pivots and through eyes, as soon as a knot is reached, the whole thread tightens up and meets the entire weight of stopping the machine. There is no resiliency and no control of the thread, and the chief concern of the device is the stopping of a knitting machine when the thread breaks, and not as in the patent in suit when a knot or enlargement is reached.

Patent No. 808,475, issued to Arthur L. Patterson, for electric stop motion for knitting machines, dated December 26, 1905, discloses a device radically different from the patent in suit. The only provision made for resiliency is to increase the inclination of a bar, and there are no springs. The device operates by breakage.

Defendant did not call any expert, but contented himself with obtaining the opinion of plaintiff's expert witness with reference to such patents while on the stand. I therefore do not think it is necessary to further discuss each of the patents of the prior art separately, but that the matter may be summed up by saying that the essential difference between the patent in suit and the prior art is that in the patent in suit there is a suspension member provided with a guard for holding the normal condition operable as a safety device, when the tension is increased or immovable, having a resilient spring contact, or resilient electrical contact, whereby the thread is not necessarily broken when the tension is sufficient to throw it off the guard, and that none of these elements are found in any of the patents of the prior art offered in evidence herein.

Many of the elements of the claims of the patent in suit are old, but, even if all the elements were old, there would still be invention, because there is a new combination with a new mode of operation.

The defendant attempts to make a defense of prior uses.

The first by Joseph Jacobs, a manufacturer of stop motions, who produced no stop motion which he could identify as made by him, and no documentary evidence of the designing or manufacturing of a stop motion of any particular description, and who was shown to have been sued by plaintiff for infringement of the patent in suit and to have consented to a decree.

There is no evidence that the stop motion to which he testified as having been made by his company was identical with that of the patent in suit. It further appears that he purchased of plaintiff stop motions long after he testified that the Eureka stop motions had been made by a firm in which he was a partner.

I am convinced that the stop motion marked "Eureka," exhibited to the witness, and which from outside appearance he said was made in 1908 or thereabouts, was made by the plaintiff in 1916 or 1917, long after

the concern in which Jacobs was a partner had gone out of business.

The second, Morris Shapiro, a manufacturer of knit goods, testified largely to generalities. He produced no stop motion that he says he purchased in 1911, and no documentary evidence of any kind, and no evidence that the stop motion he claims to have purchased in 1911 was identical with the patent in suit.

The third, Selig Broadwin, engaged in the knitting machine business, who likewise produced no stop motion that he could identify as handled by him in 1913, and no documentary evidence to show that he had handled stop motions of any particular description, much less any identical with the patent in suit. Further, he has occasionally purchased stop motions from plaintiff since 1913.

The fourth, the defendant in person. He is a nephew of the plaintiff, and was for a time in his employ. He presented no stop motion made by him in 1909 or 1910, and no documentary evidence of making any. He offered in evidence a copy of a Patent Office drawing, which he said was an invention on which he sought to get a patent in 1910. This drawing was of a device to stop the machine when the thread breaks, not when a knot or enlargement is found, and was a mere end detector, not a stop motion. He further says that he purchased stop motions from the plaintiff some time since 1912.

The source of the very exhibit which he says is like the stop motion he made in 1912 is unproven, and it is worthy of note that, when he went back into business of making stop motions, he did not make them like those he made in 1912.

The evidence offered to show prior uses is not that certain and definite evidence which is required to overcome the validity of a patent, but the kind of evidence which the courts have condemned. The Barbed Wire Patent, 143 U. S. 275, 284, 12 S. Ct. 443, 36 L. Ed. 154.

Defendant attempted to make a defense based on the file wrapper and contents, but the only defense that could be made would be that of estoppel, and I find no estoppel based on the acceptance of the rejection and cancellation of proposed claims 4, 5, and 6 in the application that renders invalid the claims of the patent in suit.

The patent in suit is operable and has enjoyed commercial success. What the defendant thinks of the patent in suit is more clearly shown by his actions than by his words. Imitation is the sincerest form of flattery.

The patent in suit is valid. We therefore come to the question of infringement.

The claims of the patent in suit read on the defendant's device, and every element or the equivalent thereof of the claims of the patent in suit is found in the defendant's device; the movable wire secured to the support in the defendant's device, being the equivalent of "a hooked member having its nose or end normally extending through said slot" of the patent in suit, and the round spring inside the box in the defendant's device being the equivalent of the leaf spring in the patent in suit.

While there is a slight difference in structure between the wire pivoted at about its center and capable of falling between the two prongs of the porcelain arm, unless held up in place by the thread in the defendant's device, and the hooked extension which is a fixed and rigid part of the top plate and serves the purpose of preventing the thread from slipping off the porcelain arm for any cause save a sufficient depression thereof to stop the machine in the patent in suit, it is not a mechanical difference nor a difference that affects the issues herein, because, while the hooked arm of the defendant's device remains in place, it serves exactly the same purpose as the hooked extension of the top plate in the patent in suit.

What the defendant has done is to aggregate with the infringing device what is known as an "end detector," an unpatentable mechanical device, being a wire resting against thread and concerned with stopping the machine when the thread comes to an end, and wholly independent in its action and function of the device in suit, which is concerned with stopping the machine when the thread comes to a knot, and not when it comes to an end.

Defendant cannot escape infringement simply because his device, otherwise infringing, accomplishes some result outside of the patent in suit.

The round spring inside the box in the defendant's device is the equivalent of the leaf spring of the patent in suit, and performs the same function in the same way; when the lever in either device is depressed at one end, the other end makes contact with the wire spring or the leaf spring, with the same result of making electrical contact.

I am unable to find that the plaintiff by his acceptance of the rejection and cancellation of proposed claims 4, 5, and 6 of his

application estopped himself from claiming broadly enough to include the defendant's device, nor do I believe that, although the plaintiff's patent is a narrow one, it is so narrow that it has no range of equivalents.

On the contrary, it is entitled to a range of equivalents broad enough to protect the invention of the patent in suit, and it is for that only that plaintiff contends.

Defendant contends that his device follows the prior art, and, while this may be true in the sense that some of the elements of his device are structurally the same as those found in the prior art, it is not true in the broad sense, because they are not found in the same combination.

The defendant infringes all three of the claims of the patent in suit.

The plaintiff's contention that the defendant's infringements were of an aggravated type, such that they would of themselves constitute a cause of action for relief for unfair competition, were the necessary jurisdictional facts here present, was not sustained, and that portion of the complaint is dismissed.

Defendant did not change his surname for the purpose of infringing plaintiff's patent, as he had assumed the name of Wachsman years before, and even used that name when employed by plaintiff, and defendant's son certainly did not misdescribe himself, even if Mr. Belsky thought he was the son of the plaintiff.

Defendant marked his device with his name "J. Wachsman, Pat. Applied For," and by the circular offered in evidence clearly showed that he was not misrepresenting himself as the plaintiff, or the devices manufactured by him as those manufactured by the plaintiff.

A decree may be entered in favor of the plaintiff, as indicated in this opinion, against the defendant, with injunction, costs, and the usual order of reference.